# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| The Public Warehousing Company | ) | ASBCA No. 56022 |
| | ) | |
| Under Contract Nos. SPO300-03-D-3061 | ) | |
| SPM300-05-D-3119 | ) | |

APPEARANCES FOR THE APPELLANT:        Michael R. Charness, Esq.
                                      Adrianne L. Goins, Esq.
                                      Bryan T. Bunting, Esq.
                                      Erin N. Rankin, Esq.
                                        Vinson & Elkins LLP
                                        Washington, DC

APPEARANCES FOR THE GOVERNMENT:       Daniel K. Poling, Esq.
                                        DLA Chief Trial Attorney
                                      Kristin K. Bray, Esq.
                                        Senior Trial Attorney
                                      Elizabeth Amato-Radley, Esq.
                                        Trial Attorney
                                        DLA Troop Support
                                        Philadelphia, PA

## OPINION BY ADMINISTRATIVE JUDGE TING

The Public Warehousing Company (PWC) contracted with Defense Supply Center Philadelphia (DSCP) to supply and deliver food to government customers at various locations inside Iraq's Operational Deployment Zone. PWC submitted a $12.49 million claim, subsequently increased to $13.37 million, said to have resulted from some of its delivery trucks being held in Iraq for various reasons for over 29 days before returning to Kuwait. The contracting officer (CO) denied the claim on the bases that PWC agreed to the 29-day cap when it executed Modification No. P00027 (Mod. 27) and PWC failed to demonstrate that the transportation fees it received up to the 29-day cap – established at twice the average truck return duration – were unfair, unreasonable or inequitable. PWC timely appealed the CO's decision. The parties presented only entitlement issues for decision. We have jurisdiction under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101-7109.

1. PWC, now known as Agility, is a public company organized under the laws of Kuwait. DSCP, now known as DLA Troop Support, is a sub-agency of the Defense Logistics Agency (DLA), an agency within the Department of Defense (DoD). DSCP supports U.S. military personnel by providing them with food, clothing and medicines, among other supplies.[1]

2. The Subsistence Prime Vendor (SPV) Program is a regionally based program under which DSCP contracts with commercial enterprises to supply and distribute food to government customers (tr. 2/20).

3. On 10 May 2002, DSCP issued Solicitation No. SPO300-02-R-4003 for an Indefinite-Delivery/Indefinite-Quantity (IDIQ) commercial item type contract to provide food and non-food products to the military and other DLA customers in three overseas zones (OCONUS): Zone I-Northern Europe, Zone II-Southern Europe and Zone III-Middle East (R4, tab 1 at 1, 7). Offerors were requested to submit pricing for all core items in the applicable zone based on this pricing formula: Unit Price = Delivered Price + Fixed Distribution Price (or Fee) (*id.* at 11).

4. On 30 May 2003, DSCP awarded Contract No. SPO300-03-D-3061 (Contract 3061 or PV1 contract) to PWC. The contract, in the estimated award amount of $22,391,904.00, was for PWC to provide "Full Line Food and Non-Food Distribution" for authorized customers in the Middle East Zone (Kuwait & Qatar) for one year, starting from the date of the first order. (R4, tab 10 at 1) The contract allowed the CO to extend its term for "four (4) additional one-year period(s) by written notice" (*id.* at 19).

5. In connection with the pricing formula (Unit Price = Delivered Price + Fixed Distribution Price), Contract 3061 defined "Unit Price" as "the total price (in U.S. currency) that is charged to DSCP per unit for a product delivered to the Government." "Delivered Price" for CONUS purchases is defined as "the manufacturer/supplier's actual invoice price (in U.S. currency) to deliver product to the Prime Vendor's CONUS distribution point." The "Delivered Price" for OCONUS purchases is defined as "the manufacturer/supplier's actual invoice price (in U.S. currency) to deliver product to the Prime Vendor's OCONUS distribution point." The "Distribution Price" is defined as "a firm fixed price, offered as a dollar amount, which represents all elements of the unit price, <u>other than</u> the delivered price." The contract pricing provision states that the distribution price "typically consists of the Prime Vendor's projected general and administrative expenses, overhead, profit, packaging costs,

---

[1] *See* our previous decision – *The Public Warehousing Co.*, ASBCA No. 56022, 11-2 BCA ¶ 34,788 at 171,219.

transportation cost from the Prime Vendor's OCONUS distribution facility(s) to the final delivery point or any other projected expenses associated with the distribution function." (R4, tab 10 at 3, 4) This appeal concerns the distribution price component of the pricing formula as subsequently modified by the parties.

Mod. 1

6. The parties entered into bilateral Modification No. P00001 (Mod. 1) in June 2003. C.T. Switzer, PWC's General Manager (GM Switzer) signed for PWC, and Thomas E. Haley (CO Haley) signed for DSCP. Mod. 1 was effective as of 27 June 2003. (R4, tab 11 at 1) It implemented the Operational Deployment Zone provision referenced in the solicitation and incorporated as a part of Contract 3061. It established "separate ordering and delivery requirements for Operation Iraqi Freedom (OIF) Initiatives in the country of Iraq area of operations." (*Id.* at 3)

7. Paragraph 2 of Mod. 1 estimated that there would initially be approximately 24 Army and 3 Air Force delivery sites in Iraq. It estimated that requirements under the contract could increase by as much as 1,200% over the original estimated contract dollar amount. Paragraph 2 also projected that "[t]he round-trip from this PWC distribution platform in Salat, Kuwait could vary from one (1) day for the closest proximity customers to seven (7) days for the farthest proximity customers." The paragraph required PWC delivery trucks "travel as part of a U.S. military escorted convoy" and stated that "[t]his operational process could be subject to change should the zone achieve a more stable environment and transition." (R4, tab 11 at 3)

8. Paragraph 4 of Mod. 1 provided, in part, that "[t]rucks will return to PWC upon completion of unloading, and trucks will not be used at the sites for storage purposes" (R4, tab 11 at 4). PWC would later contend that this provision was never changed and remained as a part of DSCP's contractual obligations.

9. Paragraph 6 of Mod. 1 provided:

> Except as provided herein, the Government does not assume any liability for any loss incurred by the Prime Vendor in the performance of this Iraq Deployment Zone, including but not limited to, loss of vehicles, personnel, or product. Furthermore, the Government is not liable for any loss resulting from any delays in assembling or deploying

3

the aforementioned military escorted convoy provided to the Prime Vendor by the Government.

(R4, tab 11 at 6)

10. Anticipating that the distribution prices might have to be adjusted in a war zone, paragraphs 7 and 8 of Mod. 1 provided:

> 7. If additional deployment zone fees are warranted above those distribution prices awarded, these fees will be negotiated at a later date.
>
> 8. The Government reserves the right to re-negotiate trucking transport fees, once stabilization and transition has occurred in Iraq, resulting in U.S. military convoys to be no longer necessary.

(R4, tab 11 at 7)

Mod. 2

11. PWC's GM Switzer and CO Haley signed Modification No. P00002 (Mod. 2) on 7 and 9 July 2003 respectively. Mod. 2, effective 1 July 2003, established, among other things, "the mutually agreed upon pricing structure for...the Iraq Deployment Zone, to include additional transport costs to be paid by the Government, above the awarded distribution...fee structure." The additional transport costs associated with deliveries to the Iraq deployment zone agreed upon were to be determined as follows:

Refrigerated Truck Transport to Iraq from PWC
- 3 day round trip minimum       $2050.00 per truck
- Additional days over (3)       $645.00 per truck per day

Dry Truck Transport to Iraq from PWC
- 3 day round trip minimum       $1600.00 per truck
- Additional days over (3)       $475.00 per truck per day

(R4, tab 12 at 1-3)

12. Mod. 2 provided that for both refrigerated trucks (reefers) and dry trucks, "[d]ays will be charged based upon time of reporting of loading until truck(s) return(s) to PWC distribution facility in Kuwait" (R4, tab 12 at 3). There was no maximum or cap on the additional transport fees payable under Mod. 2. Thus, if a truck did not

4

return for an extended period of time that truck's per day fee would keep accumulating without limitation. A price analysis in the record indicates that DSCP determined that the $645.00 per day for a reefer and the $475.00 per day for a dry truck returning after the 3-day round trip were reasonable (app. supp. R4, tab 731).

Ramp-Up Period

13. Delivery of food into Iraq did not take place right after award of Contract 3061 in May 2003. For a contract of "this magnitude" and "outside the United States," there was a "ramp up period" before "physical distribution [could] actually take place" (tr. 2/22). The troops initially relied on operational rations such as meals-ready-to-eat (MREs). Later, the troops were supplemented with "fruits and vegetables or energy bars or energy drinks." The Army then transitioned into "a cafeteria type...food from the prime vendor" sourced from the United States. Initially, PWC was delivering rations, and it gradually transitioned into delivering other types of food. (Tr. 2/24) After what was described as a "crawl/walk/run" type of tempo, delivery into Iraq began "later in the calendar year" (tr. 2/23).

14. When PWC began deliveries during the ramp-up period, it had numerous problems: PWC had no in-transit visibility of its trucks; the military did not have enough storage facilities to store offloaded food from the trucks thus delaying their return; PWC's drivers were not in place when the convoys were ready to leave; and there were truck breakdowns, accidents, and sniper activities that delayed deliveries and returns. (Tr. 1/35-36)

The Hub and Spoke System

15. Iraq is about two-thirds the size of the State of Texas (tr. 4/97). For military supply purposes, it was traversable only by major roads (tr. 6/32-33). Going north from Kuwait into Iraq, the Army established a "hub and spoke" system. A hub contained "a large concentration of logistics people and units" and dining facilities (DFACs). A spoke site was a "customer site" or a forward operating base (FOB) supported by a hub. (Tr. 6/135-37, 4/40) Spoke sites had mobile kitchen trailers (MKTs) (tr. 1/96).

16. Proceeding north from Navistar in Kuwait into Iraq, the Army established hubs at Cedar, Scania, BIAP (Baghdad International Airport), Taji, Anaconda and Speicher. Major hubs such as BIAP supported as many as 27 spoke sites. Smaller hubs such as Cedar and Taji supported two spoke sites. (App. supp. R4, tab 509; tr. 6/13, 8/10-11)

17. Before entering a hub, PWC's trucks would be inspected (tr. 6/50). The trucks would then go into a "control area." From there, trucks were moved by

5

ordering customers, under escort, to their destinations (DFACs or MKTs) to unload. Upon unloading, the customers would return the trucks, again under escort, to the hub where they would wait for a convoy to return to Kuwait. (Tr. 6/27, 50, 100-01)

18. During the war, the Marines' area of responsibility (AOR) included western Iraq, the Al-Asad area, and the border areas with Jordan and Syria (tr. 7/40). At the Marine FOBs, conditions were "very austere." There were no "fixed feeding facilities," and the MKTs had no refrigeration. At these sites, the soldiers would keep the refrigerated trucks for storage for milk and fresh fruits and vegetables. (Tr. 6/148) In addition, Marines were given the authority to control movement of trucks into and out of their AOR. Marine officers "made the call" on when to use "combat assets" to escort PWC trucks to and from the hub. (Tr. 6/156-57)

Convoy and Escort Delays

19. In addition to truck returns being delayed by storage issues, truck returns could be affected by convoy and escort delays. Convoys were controlled by the Military Control Teams or Military Control Battalions of the Multi-National Forces-Iraq (MNF-I) (tr. 2/28). Military escorts consisted of "armored vehicle[s] with heavy machine guns and communications and control equipment." PWC trucks were not allowed to move without escort. (Tr. 6/101)

20. Truck movements were dictated by a movement order or a FRAGO.[2] FRAGOs were signed daily by the general in charge. They contained instructions on what routes were opened, what roads to take, and when convoys could be on the roads. (Tr. 6/139) Convoys travelled within a "movement window," a period of time generally four or five hours at night during which military commanders determined convoys could be on the roads (tr. 6/104)

21. Convoy movements were planned through nightly meetings at the Joint Distribution Board (JDB) and through morning meetings at the Joint Coordination and Logistics Board (JCLB) (tr. 6/52). The planning sessions involved commodity managers of every class of supply: food, fuel, ammunition, construction and medical supplies. Based upon which commodities were running low, the Army determined "who moved what each night." (Tr. 6/114-15)

22. On any given day during late 2004 into 2005, there were roughly 1,200 to 1,300 PWC trucks in Iraq (tr. 4/11). Loaded food trucks leaving PWC facilities would go to Navistar in Kuwait to travel as a part of a military escorted convoy. After trucks crossed the border into Iraq, they would go to Cedar, the first hub. If a truck's

---

[2] A FRAGO is a "Fragmentary Order," an order affecting a piece, or fragment, of a previously issued Operations Order (app. br., ex. B at 3).

destination was further north, it would proceed from hub to hub until it reached its destination hub. (Tr. 8/11-12)

23. When PWC trucks traveled on Iraq's main supply routes (MSRs), they were under the Army's control (tr. 6/53). When trucks reached a destination hub, they were sent to a staging area where they would wait for customer escorts to the ordering DFACs and the MKTs. The customers at the destinations controlled offloading of the trucks. (Tr. 6/54) After trucks were offloaded, empty trucks would be escorted back from the DFACs and MKTs to the hub for their return to Kuwait (tr. 6/55).

24. According to LTC (retired) Mary Ann O'Connor, who was the Chief of Operations, Transportation and Logistics for the 1st Corps Support Command, from October 2004 to November 2005 (tr. 6/96), combat operations could affect the priority of truck movements. If there were combat operations south of Baghdad, they could affect the truck movement scheduled for BIAP and beyond (tr. 6/117-18). And, when trucks did not move one night, trucks scheduled for the next day would be "backed up" (tr. 6/118). In addition, trucks did not move without "a helicopter with a lifesaving crew" or without JSTARS ("a flying…emergency ops center") coverage (tr. 6/119-20, 7/35).

25. The Army was under a standing order from the commanding officer to move trucks from hub to hub within 48 hours. Thus, trucks were moved within the first two nights after they arrived at a hub. Trucks that took longer than two nights to depart would be reported at nightly briefings. (Tr. 6/141) The evidence indicates, and we find, that hub-to-hub truck movements were seldom delayed beyond 72 hours (tr. 6/142).

26. Darrell Gifford was PWC's network administrator responsible for installing and maintaining PWC's MircoTransport System (tr. 4/18), a web-based real-time truck tracking software solution at every hub in Iraq (tr. 4/16, 20). According to Gifford, all trucks travelling into Iraq "should be able to get to destination and back in 10 days." Trips over 10 days would be considered "outside of the norm." (Tr. 4/68)

27. Gifford testified that from time to time, food trucks would be delayed from hub-to-hub by sandstorms[3], national events (e.g., elections) or IED (improvised explosive device) attacks. These delays on the MSRs or alternate MSRs would last "a day or so." (Tr. 4/71-73) He testified convoy movement was generally reliable both northbound into Iraq from Kuwait and southbound from Iraq into Kuwait (tr. 4/74).

---

[3] The MSRs would be shut down during sandstorms, known as "shamals," because they would present "whiteout conditions" with poor visibility. Sandstorms would last "a day or two." (Tr. 6/43, 7/33)

On the other hand, escorts from the hubs to the outlying military units and from those units back to the hubs were "more sporadic" (tr. 4/75).

### Storage-Related Delays

28. Not all hubs and DFACs had the same food storage capacity. The Marine MKTs out in the remote areas had very little storage capacity. (Tr. 3/22) The majority of the storage issues – estimated at 80% to 90% – occurred in the Marine Expedition Force (MEF) area to the west of BIAP (tr. 4/95-96). Reefers would be delayed at the outlying sites because they were used for storage (tr. 4/78). According to Sabrina Viruet, who worked for PWC from August 2004 to October 2010 as a truck coordinator and a liaison officer (tr. 8/7-8), "[s]ometimes trucks wouldn't come back" from outlying sites because the military did not have enough reefers, and were using "non-moving container[s]" of the reefers for storage, or the military did not have enough storage "so they would hold the trucks for storage" (tr. 8/32).

29. Customers at the outlying sites would also wait to escort trucks from the hubs because they lacked storage. With no capacity to store food, the soldiers did not want to be responsible for the drivers and the food trucks waiting to be unloaded. (Tr. 4/76-77) According to Viruet, the Marines caused "the biggest delay" because they were on combat missions and could not come to the hubs to get the food trucks. She testified "sometimes we had trucks sitting in the yard with food for 10 days waiting for them." (Tr. 8/30-31) While escorts could delay a truck's return "a week or two," major delays occurred when a truck was used for storage (tr. 4/80).

### Truck Delays Due to Redirection

30. Redirection of food trucks occurred because a DFAC or MKT over-ordered, and because of the "fluidity of the war zone" requiring soldiers to move from place to place (tr. 3/31). When a DFAC over-ordered, the food would be redirected, with permission of the Army's theater food advisor, to a larger site so that the food could be used quickly (tr. 7/52). While redirecting food trucks was not a daily occurrence, it did occur frequently (tr. 3/30).

31. PWC would get "very upset" when its trucks were redirected (tr. 3/37). When a redirected truck had to go to another hub, it had to travel in a convoy, adding more time and paperwork (tr. 7/53, 56). Redirection delayed a truck's return making it unavailable for the next mission (tr. 3/38, 7/56). Contracting officer representative Paul A. Burkett (COR Burkett) testified the redirection issue eventually "went away" (tr. 3/38), and he authorized payment for redirections if they fell within the 29-day cap (tr. 3/39) which was later imposed by Mod. 27 (see findings 57-71, infra).

8

<u>Mod. 19 – Operation Prime Mover</u>

32. To "optimize throughput," a six-day order cycle was developed. After an electronic order was received on day one, PWC would verify the order with the ordering customer on day two. By day three, PWC would know how many trucks would be needed to deliver the order. The trucks would be loaded on day four and staged on day five. Since PWC's trucks were required to travel in a military convoy, they would depart based upon their assigned priority and when the convoy was ordered to leave. (Tr. 2/26-28)

33. At some point, the Coalition Joint Task Force 7 (CJTF7) made a request for PWC to locate transport liaison officers (TLOs) at the hubs. In response to DSCP's request, PWC's GM Switzer by email on 29 March 2004 submitted a plan entitled "Operation Prime Mover." (Ex. G-1005) As reflected by its mission statement, Operation Prime Mover was designed "[t]o facilitate the Subsistence Prime Vendor mission by strengthening the PWC transport and distribution network throughout Iraq through the deployment of PWC [TLOs] at key transit points ('Hubs') together with the necessary life support facilities and equipment required to achieve mission objectives" (*id.* at 7). The plan showed PWC's initial TLOs deployment would cover five hubs: Scania, BIAP, Taji, Anaconda, and Speicher (*id.*). PWC estimated that an annual budget of $6.5 million would be necessary to fund the program (*id.* at 3).

34. Since the TLOs were to be stationed at the hubs and had communication capabilities, they were able to report truck movements from hub-to-hub (tr. 2/68). Because TLOs were not located with the Marines, however, information from the Marine sites "was a lot more sketchy than at the main hubs" (tr. 3/29).

35. On 10 May 2004, DSCP issued unilateral and undefinitized Modification No. P00019 (Mod. 19) to implement Operation Prime Mover. Under Mod. 19, PWC was required to deploy a maximum team of 25 TLOs to eight hub sites: Anaconda, BIAP, Camp Cedar, Navistar, Ridgeway, Scania, Speicher and Taji. The TLO's responsibilities were to (a) promote smooth throughput of PWC vehicles to the delivery drop points or Military Dining Facilities; (b) improve round trip transit time of PWC trucks; (c) provide 24 x 7 on-site point of contact for SPV transport operations; (d) improve fleet and asset shipment visibility and trace ability; (e) expedite response to breakdowns and incidents and facilitate rapid recovery of assets and personnel, and (f) enhance customer service within the Iraq SPV Program. (Supp. R4, tab 153 at 1-2)

<u>Subsistence Prime Vendor Summit</u>

36. The logistic coordination issues such as trucks being held for storage led MNF-I to convene a meeting of all key parties, including PWC, "to come together and

9

work as a team...to help out PWC...[to] manage[] their distribution assets" (tr. 2/29). A "Subsistence Prime Vendor Summit" (Summit) to discuss logistics was convened from 17 to 19 May 2004 at Camp Arifjan in Kuwait (supp. R4, tab 190 at 3; tr. 2/165). In addition to PWC personnel including GM Switzer, representatives from DSCP, Army Center for Excellence from Fort Lee, Virginia, Army Central Command Forward (CENTCOM) in Kuwait, Defense Contract Management Agency (DCMA) and the LOGCAP[4] contractor who ran the DFACs were at the Summit (tr. 2/30-31).

37. At the time the Summit was held, PWC still "did not have...personnel at those hubs to manage inside Iraq." PWC's trucks were still being delayed by sandstorms and other weather issues, truck breakdowns, drivers not being available, and insufficient storage facilities at various sites. (Tr. 2/35)

38. At the Summit, PWC's message was "we need help...[in] getting our assets back" (tr. 2/31). A PowerPoint presentation prepared by DSCP (dated 10 May 2004) stated that one of the Class I challenges was a "Lack of Refrigerated Storage throughout Iraq" (app. supp. R4, tab 620 at 3). The presentation contained the following "Problem Statement":

> Insufficient permanent/semi-permanent refrigerated storage capacity exists at both Dining Facilities (DFACs) and Field Feeding (MKT) locations throughout AOR. This results in:
> 1. Subsistence Prime Vendor (SPV) owned/leased transportation assets held "on customer site", incurring temporary holding charges and significant costs.
>
> 2. Minimized distribution efficiencies; limited # of SPV delivery assets available.
>
> 3. Addition of significant risk to food safety and spoilage[.]

(*Id.* at 4)

39. A DSCP PowerPoint presentation at the Summit entitled "Costs Incurred Due to PWC Reefer Detention," showed that, while its expectation was that average truck "turn-around" time for Iraq was 7 days (3 up, 1 on-station, 3 back), the "[a]ctual 'turnaround time,'" based on November 2003 to March 2004 data was averaging 15 days. The same presentation showed that the Army was paying $4.6 million in

---

[4] LOGCAP means Logistics Civil Augmentation Program.

average monthly detention costs for the SPV Program; and that costs were forecasted to increase to $12.2 million at full SPV by June 2004. (App. supp. R4, tab 620 at 5) In its "'Detention' versus Buy" analysis, DSCP estimated that "adequate refrigeration storage could be purchased and installed in 180 days for $52.4 M" (*id.* at 9).

40. As a result of the Summit, LTG Thomas F. Metz at the Multi-National Corps-Iraq Headquarters in Baghdad drafted a "Policy for Subsistence Prime Vendor Distribution" (policy memorandum) on 29 June 2004. This policy memorandum established the following procedures for PWC trucks to return in 48 hours:

> (a) The PWC [TLO] at each hub will notify the DFAC/escort unit at destination within 6 hours of convoy arrival at hub.
>
> (b) MSCs will send escorts to the hub (staging area) within 12 hours of notification to escort subsistence trucks to the designated DFAC.
>
> (c) Once subsistence trucks arrive at the DFAC, contractors will be required to download the trucks within 24 hours.
>
> (d) Upon completion of downloading subsistence trucks, units will escort PWC assets back to the staging area within 6 hours for retrograde back to PWC headquarters in Kuwait.

(App. supp. R4, tab 506 at GOV1293-1)

41. The copy of LTG Metz's policy memorandum in the record was not signed. The record is not clear as to whether the policy memorandum was actually issued. (Tr. 2/167) The Army was responsible for procuring the needed storage units (tr. 1/137). As our findings to follow will make clear, despite the goals set out in the policy memorandum, the Army was unable to deliver the necessary storage units in a timely manner. Consequently, the procedures set out in the policy memorandum were not always followed.

42. Army CPT Chris Sinclair's 21 July 2004 email reported to his superiors and GM Switzer that "[c]urrently there are 35 PWC trucks in the yard waiting to be down loaded," and "DFACs are holding onto the [reefers] from anywhere between two to four weeks." He also reported there was a problem with PWC's vehicle maintenance, and it was "not uncommon for either the trucks or the [reefers] to breakdown while enroute or while there at Al Asad." (App. supp. R4, tab 507)

11

43. After visiting the MEF (Marine) area, CPT Sinclair reported to his superiors and GM Switzer on 31 July 2004 that he observed "over seventy [PWC] assets at Al Asad either waiting to be down loaded or waiting to be returned to Kuwait." His email went on to say "The MEF area has a lack of cold storage...which contributes to the length of time the [reefers] spend at these sites." He said he believed "PWC's mission in the MEF area will grow and the need for a T.O. [transportation officer] team will also increase." (App. supp. R4, tab 510 at 4335)

## Unlimited Truck Charges Under Mod. 2

44. Data kept by DSCP indicates that from November 2003 to March 2004, when Mod. 2 was in effect, the average turnaround time for dry trucks was between 7 to 12 days and the average turnaround time for reefers was between 13 to 24 days. The average turnaround time for all trucks was between 10 to 21 days. (Ex. G-1000; tr. 1/52-53)

45. A spreadsheet in the record showed 1,000 trucks were deployed into Iraq from 1-15 June 2004. One reefer departed PWC's facility on 5 January 2004 but did not return until 6 June 2004. In that case, PWC charged, and the government paid, a minimum 3-day charge of $2,050 and an extra 151-day charge of $97,395 for a total charge of $99,445. (Ex. G-1001 at 1) Other examples on the same spreadsheet showed PWC charged $82,030, $65,905, and $63,325 for similarly situated reefers (id.). DSCP offered the spreadsheet to show what CO Linda L. Ford (CO Ford) was concerned about when she entered into negotiations with GM Switzer to restructure the Mod. 2 distribution fee (tr. 1/47-48).

46. CO Ford testified when Mod. 2 was written, "there was no anticipation that truck trips would take that long" and "having a contract written where you'll pay $645 a day, every day that the truck [was] out [would] end up paying...for the truck." She testified that she decided to put a cap on the number of days that the government would pay for a truck trip in the upcoming negotiations with PWC because the government was not "in the business of paying for a truck," but "in the business of paying for deliveries." (Tr. 1/54-55)

## Negotiations Preceding Execution of Mod. 27

47. As reflected by GM Switzer's and CO Ford's email exchanges, discussions relating to an adjustment to the distribution fee began in August 2004. On 11 August 2004, GM Switzer sent CO Ford by email PWC's budget and pricing proposal relating to the "Iraq Transport Operations and Squad Leader Initiative." GM Switzer stated in his email "With regard to the adjustment of distribution fee to accommodate the rise in

the cost of the TO & SL missions we have run our analysis and arrived at a proposed blanket increase of 58% to the distribution fee." His email went on to say,

> As our mission objectives are achieved we will [have] a reduction in transit times and consequently less trucks in the IZ. The savings to DSCP derived from a faster turn time and less assets in theatre will easily cover the cost of this mission. Couple this consideration with other less tangible benefits such as less people in theatre, reduced demand on life support, reduced demand on security resources.

(App. supp. R4, tab 523 at 5190-91)

48. The Transport Operations and Squad Leader Initiative or Program (TO & SL Program) was designed to improve PWC's logistics. Unlike the TLOs who coordinated truck movements from the hubs, SLs traveled with the convoys. They coordinated with TLOs and went to outlying areas if driver issues needed to be resolved or delivery notes needed to be signed. (Tr. 4/92-93, 8/59) A part of the negotiations in what would become Mod. 27 involved adding TLOs and SLs to the new distribution fee structure. CO Ford testified "there was no way I could pay for a transportation officer [TLO] and squad leader program without putting a cap" on the open-ended fees PWC was charging under Mod. 2 (tr. 1/110).

49. In response to GM Switzer's proposal, CO Ford's 8 September 2004 email attached an "interim mod authorizing the additional TLO personnel numbers," and advised that "[c]ustomer approval on the SL initiative remains pending." CO Ford's email then went on to say "As we discussed earlier, I also placed a cap on the number of allowable [days for] fees and restructured the transportation fees to better fit the current Iraq operation without making changes to the fee." CO Ford then told GM Switzer "Your comments/suggestions in regard to this language are welcome." (App. supp. R4, tab 523 at 5190)

50. GM Switzer's 9 September 2004 email to CO Ford expressed surprise that the SL program had not yet been approved and asked if PWC should stop because it had "already spent a lot of money to get this started." He then said "The rest of the Mod's intention is basically OK with us as we discussed over the phone. This structure will force more discipline into the system which our T[L]Os and SLs will be enforcing." With respect to Paragraph 3 of the proposed modification, GM Switzer commented that it would be "a major administrative burden for the Military, PWC, and DSCP to track, especially since there is still limited discipline in the IZ [Iraq Zone] with events happening all the time that are out of our control to manage even with the TO program." He then said "I can see the cap in place with documentation

13

required for any trucks exceeding the cap. But to do this for your established minimums when they are all doing it and our round-trip average is around 18 days, will be extremely burdensome at this time." (App. supp. R4, tab 523 at 5189)

51. From this email reply, we find GM Switzer understood the consequences of establishing a cap on the transportation fee structure proposed by CO Ford. We find that if GM Switzer disagreed with the concept of a cap, he would have voiced his objection just as he questioned the practicality of requiring documentation for the established minimum truck trip fees CO Ford included in her proposed mod. Instead, he stated "The rest of the Mod's intention is basically OK with us as we discussed over the phone" (app. supp. R4, tab 523 at 5189).

52. CO Ford's 9 September 2004 email reply confirmed a teleconference that morning in which GM Switzer was advised that DSCP was "still seeking to obtain the required authorization" for the SL program. CO Ford advised GM Switzer that she had "no objection to separating the TO and SL budgets in an attempt to speed up the process." CO Ford went on to say that GM Switzer's comments on documentation for trucks subject to round trip minimums were well taken, and she had made changes accordingly. (App. supp. R4, tab 523 at 5188)

53. GM Switzer's email to CO Ford the following day, 10 September 2004, stated "The changes to the Mod are appreciated and I think they are workable. Unless anyone else has an issue, I will have this signed and to you by tomorrow. When will the new fee structure begin?" (App. supp. R4, tab 523 at 5188) In noticing details like when the new free structure would begin, we find GM Switzer as someone who would unlikely leave issues unresolved which could present problems later on.

54. GM Switzer's 14 September 2004 email to CO Ford reminded her that PWC needed a start date for the new rates for billing purposes. In the same email, GM Switzer expressed "real reservations about the maximum cap being unqualified." He said beginning 1 September 2004, PWC would report all vehicles out 22 days as potentially exceeding the 29-day cap. To protect PWC, he asked if DSCP and the government would support PWC's demand to return its trucks that had not completed their missions. He indicated that PWC would "prefer to have the ability to submit exceptions to the 29 day rule if the situation is unavoidable despite our best efforts to prevent it." His email said that he looked forward to CO Ford's comment "so that we can proceed with signing the Mod." (App. supp. R4, tab 527 at 342-43)

55. We find GM Switzer understood before he signed Mod. 27, that the 29-day cap CO Ford established was unqualified or without exception as to the causes of delay. We find that GM Switzer indicated a preference for an ability to submit exceptions to the 29-day cap but did not insist upon that ability as a deal breaker.

14

56. As reflected in CO Ford's 15 September 2004 email reply the next day, she had a discussion with GM Switzer "earlier" that day. The record does not reveal what was discussed. As a result of that discussion, CO Ford's email attached a copy of a "revised mod" that established 16 September 2004 as the start date for the new transportation fees. The revised mod did not remove the 29-day cap. CO Ford's email said, however, "exceptions to the 29 day rule will only be considered in the form of a claim." The email revised the minimum number of TLOs to perform on a 24 hour/7 day per week schedule from 72 to 81. CO Ford's email told GM Switzer to "Please sign and return the attached mod *or advise if additional changes are required.*" (App. supp. R4, tab 527 at 342) (Emphasis added)

Mod. 27 as Signed by the Parties

57. GM Switzer did not advise any additional changes were required; he signed Mod. 27 on 19 September 2004. CO Ford signed Mod. 27 the next day on 20 September 2004. Block 3 of the modification indicated 16 September 2004 as the effective date. Block 14 of the modification stated "Except as provided herein, all terms and conditions of the [Contract] as heretofore changed, remains unchanged and in full force and effect." (R4, tab 13)

58. As signed by the GM Switzer on behalf of PWC and CO Ford on behalf of DSCP, Mod. 27 provided:

1. The requirement for PWC to deploy a maximum team of 25 Transportation Liaison Officer's (TLO's) into the Iraq Theater was added to the PWC contract number SPO300-03-D-3061 via Contract Modification P00019 dated to be effective on 10 May 2004. This contract modification P00027 establishes an increased requirement for the maximum number of TLO team members from 25 to 94. As a minimum, 81 TLO's are required to perform on a 24 hour, 7 days per week schedule.

2. Transportation fees paid by the Government, above the awarded distribution category fee structure, were established for the Iraq Deployment Zone via Contract Modification P00002, dated to be effective on 01 July 2003. *This contract modification P00027 restructures the transportation fees for the Iraq Deployment Zone* to better fit the current deployment zone structure without modifying the fee *and establishes a maximum number of days applicable for*

15

*the transportation fees as follows.* The start date for the following rates is September 16, 2004. The rates shall apply to all PWC trucks that depart from Kuwait to Iraq on or after September 16, 2004.

a. Truck Transport to Iraq "South" (South of Scania) from PWC Kuwait:
   - 4 day round trip minimum
   - $2,695.00 per refrigerated truck
   - $2,075.00 per dry truck
b. Truck Transport to Iraq "Central" (between Scania & Anaconda) from PWC Kuwait:
   - 5 day round trip minimum
   - $3,340.00 per refrigerated truck
   - $2,550.00 per dry truck
c. Truck Transport to Iraq "North" (North of Anaconda) from PWC Kuwait:
   - 10 day round trip minimum
   - $6,565.00 per refrigerated truck
   - $4,925.00 per dry truck
d. Additional days beyond the established minimum:
   - $645.00 per refrigerated truck per day
   - $475.00 per dry truck per day
e. *The maximum number of allowable trip days is 29. The Government will not pay transportation fees beyond this established maximum.* The maximum number of days shall apply to all PWC trucks that depart from Kuwait to Iraq on or after September 16, 2004.

3. The "additional days beyond the established minimum" fees are only applicable if the delay is customer caused; i.e. Hub, DFAC or MKT not having the capability to off load and return the truck.

4. All invoices must be verified and certified by the DSCP Contracting Officer Representati[ve], Administrative Contracting Officer or Contracting Officer.

(R4, tab 13) (Emphasis added)

16

59. We find the transportation fee structure established by agreement of the parties and effective 1 July 2003 in Mod. 2 was replaced by a different fee structure in bilateral Mod. 27 effective 16 September 2004.

60. Unlike Mod. 2, Mod. 27 divided truck transportation into Iraq into three separate zones: South, Central and North. Also unlike Mod. 2, Mod. 27 established a different round trip minimum fee for refrigerated and dry trucks for each zone: For trucks going into South Iraq, Mod. 27 allowed a 4-day round trip minimum fee at $2,695.00 per refrigerated truck and $2,075.00 per dry truck (R4, tab 13, ¶ 2.a.); for trucks going into Central Iraq, Mod. 27 allowed a 5-day round trip minimum fee at $3,340.00 per refrigerated truck and $2,550.00 per dry truck (R4, tab 13, ¶ 2.b.); and for truck going into North Iraq, Mod. 27 allowed a 10-day round trip minimum fee at $6,565.00 per refrigerated truck and $4,925.00 per dry truck (R4, tab 13, ¶ 2.c.).

61. Mod. 27 did not change the Mod. 2 rate of $645.00 per refrigerated truck per day for additional days a truck was out beyond the minimum round trip days (R4, tab 13, ¶ 2.d.). Similarly, Mod. 27 did not change the Mod. 2 rate of $475.00 per dry truck per day for additional days that truck was out beyond the minimum round trip days (*id.*). Unlike Mod. 2, which allowed the $645.00 per day per refrigerated truck and the $475.00 per day per dry truck to accumulate without limitation, Mod. 27 established a 29-day cap for trip days allowable: Paragraph 2.e. of Mod. 27 stated: "The maximum number of allowable trip days is 29. The Government will not pay transportation fees beyond this established maximum." Notably absent from Mod. 27 was any mention of any exceptions to the 29-day cap.

Application of the 29-Day Rule

62. Under Mod. 27, for example, a reefer going to South Iraq would be paid a 4-day round trip minimum of $2,695.00 even if that truck returned in two days. If that reefer returned to Kuwait in 60 days, and it was delayed at a DFAC for 42 days due to lack of storage at that site, PWC would be paid $16,125.00 ($645.00 x 25 days (29 days – 4 days)) plus the $2,695.00 or a total of $18,820.

63. Similarly, a reefer going to Central Iraq would be paid a 5-day round trip minimum of $3,340.00. If that reefer returned to Kuwait in 35 days, and it was delayed at a DFAC for 30 days due to lack of storage at that site, PWC would be paid $15,480.00 ($645.00 x 24 days (29 days – 5 days)) plus the $3,340.00 or a total of $18,820.00.

64. Likewise, a dry truck going to North Iraq would be paid a 10-day round trip minimum of $4,925.00. If that dry truck returned to Kuwait in 50 days because it was redirected to another site and was delayed for 30 days, PWC would be paid $9,025.00 ($475.00 x 19 days (29 days – 10 days)) plus the $4,925.00 or a total of $13,950.00.

17

65. With the 29-day cap, we find Mod. 27 essentially converted Mod. 2's open-ended distribution fee structure of $645.00 per reefer per day and $475.00 per dry truck per day for additional days beyond the established minimum into a fixed liability transportation fee structure not to exceed $18,820.00 per reefer and $13,950.00 per dry truck.

### Rationale for the 29-Day Cap

66. Because GM Switzer was located in Kuwait in 2004, and CO Ford was located at DSCP in Philadelphia, negotiations between them on the terms of Mod. 27 were conducted by email and telephone (tr. 1/115). Thus, testimony and the words used in the emails are important in understanding the parties' intent. In this case, CO Ford testified and explained her understanding of Mod. 27, and she was extensively cross-examined by PWC counsel. GM Switzer did not testify.[5] Consequently, without his testimony we are left with no explanation of why he signed Mod. 27 with a 29-day cap which he understood to be "unqualified," and which did not include what he had "real reservations about" when he was given the opportunity to "advise if additional changes are required" (findings 54, 56).

67. CO Ford explained at the hearing that even though the number of trucks out for over 29 days was insignificant, some trucks could be out for long periods of time and "it didn't make sense to pay $99,000 for a truck trip, given that we were paying PWC to place people [TLOs and SLs] in the field and to minimize truck trip time" (tr. 1/112). She explained that given the average truck trip time was 15 days (tr. 1/115), establishing a 29-day cap meant the government was "paying for all of the risks associated with the contract" up to 29 days (tr. 1/112).

68. CO Ford testified that paragraph 2.e. of Mod. 27 established "the absolute maximum that we would pay for a truck trip for any one individual truck" and that "amounted to about $18,000 or a little over $18,000 at the max"[6] (tr. 1/56). She testified the 29-day would apply regardless of "the cause of delay," even if a DFAC held a truck for storage (tr. 1/57, 59) or a truck's return was delayed by military escort (tr. 1/57).

69. The fact that CO Ford established a 29-day cap – almost double the 15-day average truck return time experienced at the time – suggests that both parties

---

[5] On advice of his own counsel, GM Switzer chose not to testify in this appeal (*see* DLA letter of 27 May 2014). PWC did not list or call GM Switzer as its witness.

[6] CO Ford was apparently referring to a reefer. A dry truck would have a different maximum amount (*see* finding 64).

understood the cap was intended to shift the risks of an open-ended fee structure under Mod. 2 to a shared risk fee structure under Mod. 27. PWC was not unfamiliar with contingencies operating in a war zone. The bulk of the people it hired at its leadership levels in transportation and other areas were retired military. GM Switzer was a retired Navy officer. (Tr. 3/34)

70. Apparently in one of their conversations, GM Switzer had suggested eliminating the 29-day cap. CO Ford testified that she "pretty much rejected...lifting the 29-day cap." She acknowledged she told GM Switzer that she "would consider exceptions to the 29 days in the form of a claim." (Tr. 1/90) When pressed on cross-examination whether that statement meant PWC would be allowed to submit claims in excess of the 29 days, CO Ford testified it was "our understanding...at the time or my understanding...at the time" that she would consider granting relief where, for example, all of the trucks "were out over 29 days. And for some reason [PWC was] going to be out of business beyond his losses." She explained she could not let that happen because "[o]ur primary goal in the war zone was to make sure that we fed the troops...[and] if PWC went out of business, we would have had a difficult time doing that." As for submitting a claim for relief, CO Ford testified it was her understanding that "[a] contractor is always entitled to submit a claim if he doesn't think he's been [treated] equitably or something was unfair or unjust or inequitable." (Tr. 1/91)

71. Although at times less than precise in her language, we find overall what CO Ford was saying was the 29-day cap – being at about twice the average 15-day truck return time experienced at the time – was more than generous. We find she offered to leave the door open for claims in the event the 29-day cap caused PWC such economic hardship to the point where its ability to continue performance under the contract was threatened.

Aftermath of Mod. 27

72. On 23 October 2004, PWC's senior transport manager, Mark B. Fredenburgh (Fredenburgh) sent an email to CO Ford and others in DSCP, attaching a weekly over 10-day report. The email reported "As you can see from the pivot table, many vehicles remain at DFACs. Most of those at the hubs are returning. Storage issues continue to hamper the turn around time at some locations." (App. supp. R4, tab 546 at 86)

73. Following up, GM Switzer's 24 October 2004 email to CO Ford and others at DSCP said:

> After reviewing this [weekly over 10-day] report, we do
> have the makings of a problem with the new Transport

19

Mod that limits our billing for only 29 days. What are we suppose to do with the 105 vehicles now over 29 days? This really adds up as well as the 57 that are right behind in the 22-29 category. There are a lot of issues driving this but most of them are out of our control even with the TOs. I still believe Squad Leaders would help expedite trucks being held, but again, that is only part of the solution. We need action up in Iraq to expedite the movement [from] the customer side.

(App. supp. R4, tab 546 at 86)

74. We find GM Switzer's acknowledgment that Mod. 27 limited PWC's billing "for only 29 days," and that Mod. 27 "have the makings of a problem" reflected his understanding at the time that Mod. 27 provided no relief just because trucks did not return in 29 days. If GM Switzer had understood CO Ford to have agreed to provide relief for any customer-caused delays beyond 29 days, he would not have asked "What are we suppose to do with the 105 vehicles now over 29 days?" (Finding 73)

75. PWC's Fredenburgh provided CO Ford another 10-day report by email on 9 November 2004. This email quantified the financial impact of the 29-day cap. He reported that financial impact to PWC equated to $743,685 as of 8 November 2004. He reported that 48 trucks had returned past the 29-day mark equating to 274 non-billable truck days and 95 trucks departed after 15 September 2004 had not returned equating to 879 non-billable truck days. The email stated "As these trucks return, claims will be filed for the days exceeding the maximum." Fredenburgh asked DSCP to provide information relating to the storage capacity and meals served per day at each DFAC and MKT site so that PWC "could help provide specifics on where more storage is needed." (App. supp. R4, tab 559; tr. 1/95-96)

76. Fredenburgh's 16 November 2004 email reported to CO Ford that the financial impact of the 29-day cap continued to grow. He reported that "[c]losed missions over 29 days equate to 77 vehicles with 515 days over in non-billable days ($332,175)" and "[e]xisting in mission trucks over 29 days is 138 vehicles for 1481 non-billable days ($955,245)." The email stated that "[w]ithin 2 months this is now above the $1 [m]illion mark" and asked "How can we address this?" The email blamed the over 29-day mission to "instances on over ordering," to "DFAC storage issues effecting [sic] the downloading of vehicles, DFAC's taking our trailers for storage, MSR closes, etc." (App. supp. R4, tab 562; tr. 1/96-97)

77. When the storage capacity of a DFAC was "maxed out," the Army would "eat through a truck" meaning the DFACs would "grab food off the truck and just build

20

menus off of what they pull off the truck" (tr. 7/23). In addition to the lack of storage capacity at various locations, over ordering food also contributed to delays in truck returns (tr. 7/12). The record shows MNC-I representative David L. Zimmerman's 12 November 2004 email to the Army's Theater Food Advisor, P. Peleti, complaining that Taji DFAC's ordering "appears to be out of control and they have too many trucks at their location…still!!" Peleti's 12 November 2004 email to the customer service representative at Taji stated "Need your help on getting these folks on ground to free up these PWC trucks and stop holding them hostage. Also if they need to minimize their order then we need to know." (App. supp. R4, tab 560)

78. Fredenburgh's 29 November 2004 email to CO Ford complained that food was being redirected due to lack of storage and over-ordering. The email cited instances where trucks were sitting at DFACs for 30 days or more and then being redirected with partial contents. The email stated "Days accumulated in total has now climbed above the $2.3 [m]illion mark for closed and in-mission vehicles." His email went on to say "I believe the intent of Mod 29 [sic] was to ensure PWC was managing their transportation effectively…. I do not believe the intention of the mod was to penalize PWC for areas beyond our control. What can we do about this situation?" (App. supp. R4, tab 566)

79. In the meantime, in preparation for the upcoming expiration of Contract 3061, DSCP's Peggy Grady advised GM Switzer in her 3 December 2004 email that a contract modification would be issued to extend the contract for six months. The email stated that "The contract modification will incorporate all current and modified actions in effect at time of signing." Grady's email requested that "the contract extension not be held up due to PWC's concern on the recent TO mod that limited the transport [fees] to 29 days," and stated that "[a]n alternate proposal may be submitted separately at any time." (App. supp. R4, tab 571 at 15733-34)

80. In response, GM Switzer's 8 December 2004 email stated:

> We are willing to accept the contract extension. However, at this time I cannot take lightly the effects of Mod 27's limitation on the transport charges. Unfortunately, the Theater has taken a turn for the worse and despite all our extra visibility and management, we are not able to move our trucks through the mission in a timely manner. The military control of our trucks and the situation has caused substantial delays where the possibility and reality of having our trucks on mission for over 29 days is more of the norm, not an infrequent exception. We do not have the ultimate control of our trucks.

21

> *Although DSCP has indicated they would be willing to accept a claim or maybe a request for equitable adjustment for compensating for the delays, this is no guarantee of being paid or if paid, what delays will be involved.*
>
> I would therefore like this matter be reviewed and discussed ASAP with a view towards resolving our situation here.

(App. supp. R4, tab 571) We find GM Switzer understood that CO Ford's willingness to consider granting a claim was a matter of discretion given the right circumstances and not a matter of contract right.

81. A 6 January 2005 email from an MNF-I representative Zimmerman to CO Ford and others reported that the company awarded the contract to provide cold storage units for the MKT sites had fallen behind in production. Instead of delivering 50 cold storage units on 28 December 2004, it would now ship 100 units on 10 February 2005. (App. supp. R4, tab 577) CO Ford acknowledged that until the MKTs received their cold storage units, they had to use reefers for storage (tr. 1/108). We find that having sufficient storage units remained a problem nearly eight months after the SPV Summit.

82. In response to CO Ford's 13 January 2005 inquiry on whether PWC would accept a modification to extend Contract 3061 for 8 additional months, GM Switzer's reply of the same day said he had "no problem with extending the contract at the same terms." His email, however, wanted CO Ford to rescind the 29-day cap:

> My only request was that the 29 day transport limitation rule for Iraq be rescinded. We have almost done as much as we can with our TO and Squad Leader Programs to provide visibility and local management of the trucks in Iraq. However there are still delays that are virtually out of our control and are driven by either the military mission, situation, or other controlling parties' inefficiencies and yet PWC is penalized for doing the work.
>
> …However, making us go through the claims process that will either be rejected or cause us significant delays in receiving compensation places us in a[n] inappropriate situation of either ignoring (even if we can) the military request and situation or absorbing costs that are not under our control. Unfortunately this has not been isolated incidents but occur on a regular and frequent case.

22

> Additionally with the projected road closures and new DFACs opening, the situation will likely get worse than get better.

(App. supp. R4, tab 580 at 15731-32) Based on this email, we find GM Switzer understood the 29-day cap shifted the risk of truck delays, for whatever reason, beyond 29 days to PWC.

83. CO Ford's 13 January 2005 email declined to rescind Mod. 27 but urged PWC to submit an alternate proposal "based on actual cost and historical truck turn around time frames." She explained why the 29-day cap was established in the first place:

> When mod 27 was written, it was my understanding that we were in agreement that a transport limitation rule was absolutely necessary given the history of delayed truck movement and the establishment of a transportation officer program.... We considered the average turn around time per truck at 18 days and agreed that only a small percentage of trucks remained out more than 29 days. To date, these figures have not significantly changed. Furthermore, it was not reasonable that PWC transportation costs continued at a rate of $645 per day for an infinite number of days. Therefore, we can not simply rescind mod 27 without doing some additional analysis.

(App. supp. R4, tab 580 at 15731)

84. Because he did not testify, there is no rebuttal to CO Ford's statement, made during the course of performance to the effect that the parties "were in agreement that a transport limitation rule was absolutely necessary." That CO Ford urged PWC to submit an alternate proposal "based on actual cost and historical truck turn around time frames," and her comment that she could not "simply rescind mod 27 without doing some additional analysis" support a finding that, as far as CO Ford was concerned, "exceptions to the 29 rule" would only be considered if it put PWC in an economic hardship situation. (Finding 83)

85. PWC's daily INTSUM[7] for 20 January 2005, four months after Mod. 27 was signed, reported that PWC had 1,232 trucks in the Iraq Zone (IZ), and that "[m]ovement across the theater, for the most part, is happening....but the single biggest issue in the IZ right now is storage at the DFACs" (app. supp. R4, tab 587).

---

[7] An INTSUM was a snapshot of truck movements at all hub locations (tr. 7/37).

PWC's daily INTSUM for 26 January 2005 reported that "Anaconda is continuing to struggle getting trucks back from the DFACs due to a lack of cold ground storage," and the "single biggest issue" at BIAP AOR "is storage capacity at the DFACs, which is causing trucks to be held" (app. supp. R4, tab 590 at 644).

86. Despite CO Ford's refusal to rescind Mod. 27, PWC entered into a bridge contract with DSCP. The bridge contract (Contract No. SPM300-05-D-3119 or PV Bridge contract), in the estimated value exceeding $1 billion, was a follow-on contract to Contract 3061. It was executed as Modification No. P00036 (Mod. 36) to Contract 3061 and it was for the period 16 February 2005 through 15 December 2005. The bridge contract provided that "[a]ll other terms and conditions of the 3061 contract remain unchanged and are hereby incorporated into contract SPM300-05-D-3119." (App. supp. R4, tab 156) Thus, knowing CO Ford's interpretation of Mod. 27 – that PWC assumed all risks of delay over 29 days – PWC agreed to extend Contract 3061 for 10 more months.

87. Trucks would be reported as in a "black" status when they remained at a hub for more than 72 hours (3 days), or at a DFAC for more than 96 hours (4 days), or at a MEF site for more than 120 hours (5 days) (app. supp. R4, tab 648; tr. 2/173, 175). PWC's daily INTSUM for 24 February 2005, five months after Mod. 27 was signed, reported the number of trucks across the IZ had spiked considerably, with 463 trucks in the "black," and with the majority of those resulting from "lack of storage at the MEF sites." It was reported that of all the trucks in a "black" status, only 1% were related to escort issues. (App. supp. R4, tab 601 at 824)

Submission of Over 29-Day Claims

88. By email on 24 February 2005, PWC's Contract Administration Officer sent CO Ford an advance copy of a "claim"[8] for additional transportation fees associated with trucks that had returned from Iraq to PWC after 29 days. The claim was in the amount of $2,951,335.00 and covered the period from 16 September 2004 to 31 December 2004. (App. supp. R4, tab 604)

89. Confused by PWC's submission, COR Burkett, who usually verified PWC's requests for payment before sending them to the CO, emailed CO Ford on 24 February 2005 and stated that he had not seen the supporting documentation for the truck trips claimed (app. supp. R4, tab 606 at 2492-0002).

---

[8] This was not a formal CDA claim. The word "claim" was used to denote that the submission was based on CO Ford's email agreement to consider "Exceptions to the 29 day rule...in the form of a claim."

90. CO Ford's 24 February 2005 email explained to COR Burkett that what PWC had submitted was not based on a contract right: "Claims are different from invoices in that PWC has no written contractual right to payment; therefore, your verification and signature is not required up front." CO Ford's email explained "Basically, PWC is instructed to submit claims directly to this office for review and decision." She went on to explain that having paid dearly for the TO & SL Program, any relief must be supported by PWC's "cost":

> Based on limited review, I can tell you right now that I'm not in favor of paying for this. We paid PWC 8.7 million for these 467 trucks and they want another 2.9 million. I will be requesting more cost verification data. Cost data that may not have been available before, should be available now. I'm also struggling with the idea of paying 15.7 million for a TO program and negotiating another 6.6 million for a SL program if we can't clearly see greater command and control of truck days out.

(App. supp. R4, tab 606 at 2492-0002)

91. When asked on cross-examination why she asked for cost data if transportation fees were capped at 29 days, CO Ford explained that she wanted to "[review] the reasonableness of [PWC's] request," and "[i]f PWC could prove that mod 27 was completely unreasonable, or unfair, or inequitable, then I would have considered paying the claim." She testified that she requested PWC's cost data because knowing how much it cost PWC to perform the trucking service would show if PWC was losing money. (Tr. 1/130-31)

92. COR Burkett testified that most of the time, trucks would return in seven to nine days, and it was his practice to "approve payment up to 29 days" when the trucks returned (tr. 3/41-42). He testified in approving invoices up to 29 days, he would err on the side of PWC even in instances of unsigned delivery documents (tr. 3/53). He acknowledged most of the time delays such as convoy/escort delays, redirections, and using trucks for storage, were customer-caused (tr. 3/54). He testified when PWC argued "they should be paid for every day the truck was up in Iraq" due to contingencies beyond its control, CO Ford would point to the 29-day cap and said "Paul, this is what the contract states. This is what we both agreed on, so this [29 days] is what will be paid." (Tr. 3/43) There is no evidence that COR Burkett approved any over 29-day truck trips.

93. CO Ford's testimony at the hearing was consistent with her interpretation of Mod. 27 during contract performance: (1) Having agreed to pay for the TO & SL Program, and having established the 29-day cap far above the 15-day average truck

return time, PWC was expected under the terms of Mod. 27 to assume the risk of all truck return delays over 29 days; and (2) Exceptions to the 29-day rule would be considered, under the right circumstances and supported by cost data, so that PWC's continued performance under the contract in keeping the troops fed would not be interrupted.

94. By email dated 8 March 2005, PWC's senior contract manager, Randolph Sawyer, advised CO Ford that PWC was gathering supporting data for additional trucks returned over 29 days from Iraq for January and February of 2005, and would submit an additional claim. Sawyer's email advised that PWC had decided to change its invoicing procedure and stated:

> We will start invoicing on the 29th day for trucks that departed after 16 September 2005 [sic] and are still remaining in Iraq (Mod. P00027). Once the truck returns…we expect to submit a claim for the additional days over 29. We will not wait until the asset returns before we submit an initial invoice.

(App. supp. R4, tab 616 at 6556) CO Ford advised Sawyer by email on 9 March 2005 that "DSCP will not accept invoices for trucks that have not returned to Kuwait as part of the normal invoicing procedure"[9] (*id.* at 6555). Sawyer's 28 March 2005 email stated that PWC believed the additional costs claimed were justified because "the customer IS holding our trucks as storage. This is in direct violation of the terms of P00001, paragraph 4, which states, 'Trucks will return to PWC upon completion of unloading, and trucks will not be used at the sites for storage purposes.'" (*Id.* at 6554)

95. In response to CO Ford's 13 January 2005 invitation to submit a proposal as an alternative to Mod. 27, PWC's 14 March 2005 email forwarded a proposal from GM Switzer. The proposal asked that Mod. 27's 29-day cap be lifted. Based on its finding that the cost to overhaul a storage unit after sitting idle was $6,800.00, GM Switzer proposed a charge of $6,800.00 to recoup this additional cost when "PWC's trucks are used for storage purposes." Alternatively, if DSCP chose to set "a max allowable trip ceiling," GM Switzer proposed "a demurrage fee of $500 per day per reefer" where its asset was used for storage. (App. supp. R4, tab 610 at 2513-2514_0002)

96. CO Ford rejected GM Switzer's proposal (tr. 1/161). She testified she told PWC she would not lift the cap because the data she had showed "the average trip times were going down" (tr. 1/154). She explained when Mod. 27 was put in place,

_____

[9] CO Ford took this position presumably because loss of vehicle was PWC's risk (finding 6, Mod. 1, ¶ 6).

26

"we never thought that [truck trips exceeding 29 days] would be eliminated totally." She testified PWC might have a case for relief "if all the truck trips ended up being more than 29 days...because it was different from the data that we had before we...put mod 27 in place." (Tr. 1/155-56)

97. Following through on his 8 March 2005 email, Sawyer submitted PWC's second claim on 25 May 2005.[10] This claim, in the amount of $4,161,020, was for PWC trucks out over the 29 days during the months of January and February of 2005. (App. supp. R4, tab 717 at 15740)

98. Mr. Matthew Paice, PWC's invoicing supervisor, advised CO Ford by email on 7 August 2005 that he had taken over responsibility for the "MOD27 over 29 days claims." Instead of sending "mountains of paperwork," Paice asked CO Ford what he needed to submit for claims that differed from normal billings. (App. supp. R4, tab 677 at 2500_0002) This was the same issue that confused COR Burkett.

99. CO Ford's 16 August 2005 email reply to Paice stated:

> Send me the mountains of paperwork. Claims must be fully supportable, we can not accept random samples of support documentation for claims. Please be sure that your paper trail is clear and concise. You must show that each delay was in fact customer caused.
>
> If we can agree that there was delay and the delay was customer caused, we will still need to negotiate an amount due, if any. As I have mentioned several times before, it would be helpful for PWC to submit *actual demurrage cost data*. For example, your first claim implies that the Gov't owes PWC $2.9M on 467 deliveries. However, we have already paid $8.7M for those deliveries. Where is the *actual cost data* to support an additional payment of $2.9M? Did your *cost* actually exceed $8.7M for the 467 deliveries? If so, by how much?

(App. supp. R4, tab 677 at 2500) (Emphasis added)

100. Had CO Ford agreed to pay $645.00 per reefer and $475.00 per dry truck as exceptions to the 29-day cap for each day these trucks were out over 29 days

---

[10] Like PWC's 24 February 2005 (first) claim, this was not a CDA claim. The word "claim" was used to denote that it was based upon CO Ford's email agreement to consider "[e]xceptions to the 29 day rule...in the form of a claim."

beyond PWC's control, she would not have asked PWC for "actual demurrage cost data," "actual cost data," and whether PWC's "cost actually exceed[ed]" the $8.7 million paid. The fact that CO Ford repeatedly asked for cost data supports a finding that, in her mind: (1) PWC had not demonstrated that, while some trucks were delayed for over 29 days, the 29-day cap for all trucks was unfair, unreasonable, or inequitable; and (2) PWC had not demonstrated that it had reached a point where its ability to continue performance under Contract 3061 was threatened. We find CO Ford was consistent in her interpretation of the circumstances under which exceptions to the 29-day rule would be considered. PWC presented no contrary interpretation from GM Switzer.

101. The position CO Ford took in 2005 was reinforced by her testimony at the hearing. CO Ford testified that in addressing PWC's over 29-day claim, she applied a two-part test. Part I was to determine if all of the delays claimed related to the storage issue. Assuming Part I was satisfied, Part II was to determine from PWC's cost data that the costs PWC incurred showed that capping truck fees at 29 days was not "realistic." She testified it would not be enough for PWC to show it was less profitable because of the truck delays. (Tr. 1/181-83) She testified that from the documents PWC submitted, she could not determine that all of the delays claimed "were related to the storage issue"[11] (tr. 1/181), and PWC provided "no data…to support that it [the 29-day cap] wasn't equitable" (tr. 1/183).

102. On 26 October 2005, PWC submitted a third "claim"[12] for over 29-day truck trips for the month of March 2005 (app. supp. R4, tabs 703, 704). This claim was in the amount of $1,138,370 (app. supp. R4, tab 717).

103. CO Ford's 17 November 2005 email advised PWC that "it is our intent to deny the 'over 29 day' claims for inadequate support…. Our final decision will be communicated no later than 9 Dec 05. PWC may submit additional information for DSCP review prior to the anticipated decision date." (App. supp. R4, tab 708 at 1972)

104. In January 2006, PWC began performance under a new Prime Vendor Contract (Contract No. SPM300-05-D-3128) (Contract 3128 or PV2 Contract). Under Contract 3128, DSCP and PWC agreed to a wholly different fee structure for trucks going into Iraq. The events underlying the claims in this appeal occurred during Contract 3061 (PV1 Contract) and Contract 3119 (PV Bridge). That period began on

---

[11] Contract 3061 assigned certain risks to PWC such as loss of vehicles and delays in assembling or deploying military escorted convoys (*see* finding 9).

[12] Like PWC's 24 February 2005 (first) and 25 May 2005 (second) claims, the word "claim" was used to denote that it was based upon CO Ford's agreement to consider "[e]xceptions to the 29 day rule…in the form of a claim."

the effective date of Mod. 27, 16 September 2004, and ended 15 December 2005, the expiration date of Contract 3119.[13]

Events Leading to PWC's Submission of its Request for Equitable Adjustment (REAs) and Certified Claim

105. The events leading to PWC's submission of its REA and certified claim were the subject of a Board decision denying DSCP's motion to dismiss for lack of jurisdiction. *See Public Warehousing Company*, ASBCA No. 56022, 11-2 BCA ¶ 34,788. For continuity and consistency, we restate or summarize, as necessary, the relevant findings in that decision.

106. After Contract 3061 expired, PWC reminded DSCP by letter dated 18 December 2005 "there is an additional $13.1 [million] outstanding from the trucks that returned after 29 days, being pursued as an REA." PWC's letter said it would be submitting an REA on a portion of the Mod. 27 amounts with supporting documents later that month. 11-2 BCA ¶ 34,788 at 171,224, finding 28.

107. On 20 December 2005, PWC submitted an REA with Attachments A through F. The REA was signed by PWC's Assistant General Manager Stephen J. Lubrano. The government contended that it never received attachments A through F. 11-2 BCA ¶ 34,788 at 171,224, finding 29.

108. On 24 May 2006, following an inquiry from Paice, CO Ford sent him an email asking him to send a copy of the certified REA letters associated with the trucks that were out over 29 days or a summary sheet of the submission. Paice replied on 29 May 2006 with a copy of the REA letter and copies of Attachments B, C, D, and E. Attachments A and F were not included with the email. 11-2 BCA ¶ 34,788 at 171,224, finding 30.

109. Not having heard from CO Ford, Paice emailed her on 28 August 2006. The email stated:

> On March 10, 2006, the Government verified receipt of a "hard" copy "Request for Equitable Adjustment (REA), October 2004 – September 2005, Submissions I, II & III" submitted to your office, concerning the retention of PWC assets past the 29-day contractual window. In addition, per the Government's request on May 24, 2006, PWC

---

[13] *See Public Warehousing Company, K.S.C.*, ASBCA No. 56116, 08-1 BCA ¶ 33,787 at 167,223, ¶ 2; (*see also* app. br. at 11).

submitted a "soft" copy, via email, of the certified REA on
May 29, 2006.

Paice asked the CO to "provide a date for a response to and resolution of these pending amounts." 11-2 BCA ¶ 34,788 at 171,224-25, finding 31.

110. On 21 December 2006, PWC submitted a two-page certified claim to CO Ford. The claim letter stated: "On December 20, 2005, PWC submitted a certified Request for Equitable Adjustment (REA), for which the company has received additional information request but no written disposition on the REA." The claim sought payment in the amount of $12,490,060.00. It attached "the documentation submitted in the earlier REA (specifically, Submissions I, II, and III on 20 December 2005), with the inclusion of the newly added Submission IV, for the costs incurred by PWC due to the Government's utilization of PWC truck asset past the 29 day maximum." In referencing and attaching them, we find that PWC had incorporated and made its 12-page 20 December 2005 REA and attachments a part of its certified claim. The claim, certified by PWC's Senior Contract Manager, James A. Kibbee, Jr., was based on the legal theory of unjust enrichment:

> Pursuant to Common Law, and under the definition of "unjust enrichment", the Government has gained a windfall (receives additional services) at the expense of PWC. As a legal doctrine, it states that the party who has thus gained must return the property (restitution) to its rightful owner, even though the property was not obtained illegally....

In invoking the legal theory of unjust enrichment, the claim letter went through a five-step question and answer analysis of the theory's legal elements.[14] 11-2 BCA ¶ 34,788 at 171,225, finding 32.

111. The REA included a 12-page narrative and referenced Attachments A through F. Attachment A was said to provide "The breakdown of costs." Attachments B, C, and D contained spreadsheets listing its trucks returning after 29 days during the period October through December 2004 (Submission I), January through February 2005 (Submission II), and March through September 2005 (Submission III). Attachment E provided a summary for Attachments B, C, and D. Attachments B, C, and D spreadsheets show how PWC arrived at the amount it claimed for each truck trip into Iraq. Attachment F was said to show "a matrix of events during the time period in question...depicting road closure dates, escort issues, elections etc, which

---

[14] The five-step analysis was apparently undertaken pursuant to a website on the subject of unjust enrichment. *See* http://en.wikipedia.org/wiki/Unjust_enrichment.

when viewed in conjunction with the dates these trucks were deployed explain a portion of the additional days." 11-2 BCA ¶ 34,788 at 171,225, finding 33.

112. PWC also forwarded separately other supporting documents including (1) Delivery Notes which indicate "when the truck has entered the camp, when it has been downloaded, and when it leaves, along with any comments or notes made," (2) MicroTransport Reports which provide trip length data and Transport Officer comments along the journey, (3) Convoy Reports which report on cargo departure time, destination, and (4) Squad Leader Reports which provide information from "eyes-on personnel." These documents occupy the bulk of the ten-volume Rule 4 file. 11-2 BCA ¶ 34,788 at 171,225, finding 34.

113. PWC's REA said there were "many reasons" why its trucks failed to return from Iraq "within the stipulated times as stated in the contract" including these six bullet point reasons listed on page 3 of the REA:

- Lack of convoy escorts

- Road closures

- Lack of storage

- Vehicles being used for missions by the Military

- Vehicles being used by other contractors

- PWC assets being utilized for recovery or other delivery missions.

11-2 BCA ¶ 34,788 at 171,225, finding 35.

114. CO Ford denied PWC's claim by decision dated 9 April 2007 for the following reasons:

> Bilateral Modification P00027, effective September 16, 2004, established a maximum number of days applicable for Iraq transport fees. It states "The maximum number of allowable trip days is 29. The Government will not pay transportation fees beyond this established maximum." The 29 day cap on the truck transport fee was established in reference to the Transportation Officers (TO) program objectives and responsibilities, awareness of the detention situation in Iraq, and the 14 day average truck transport

time. PWC was aware of this at the time it executed P00027 and agreed to the 29 day cap. Furthermore, while the subject claim acknowledges that distribution fees were already paid for each of the stated deliveries, it offers no evidence to substantiate that the amount paid was unfair, unreasonable, or inequitable. The distribution fees paid for each of the deliveries stated in the claim were fair, reasonable, equitable, and in line with the intent of P00027. As such, PWC is not entitled to an equitable adjustment.

11-2 BCA ¶ 34,788 at 171,226, finding 37.

115. PWC through its vice president and general counsel, appealed the CO decision by notice dated 29 May 2007. The Board docketed the appeal on 1 June 2007. 11-2 BCA ¶ 34,788 at 171,226, finding 38.

116. The total number of trucks, truck days, and the amounts PWC claimed for each of the four periods are summarized in the table below:

| Time Period | No. of Trucks | Truck Days | Claimed Amount |
|---|---|---|---|
| Submission I (Oct – Dec 2004) | 426 | 4,412 | $ 2,798,650.00 |
| Submission II (Jan – Feb 2005) | 367 | 4,801 | $ 3,085,425.00 |
| Submission III (Mar – Sept 2005) | 859 | 9,461 | $ 6,084,155.00 |
| Submission IV (Oct 2005 – Feb 2006) | 129 | 818 | $ 521,830.00 |
| **TOTAL** | 1,781 | 19,492 | $12,490,060.00 |

(R4, tab 14, attach. E) PWC derived the amount claimed for each period by multiplying the total number of truck days over the 29-day cap by the appropriate $645.00 or $475.00 per truck per day rates beyond the established minimum rates set out in ¶ 2.d. of Mod. 27. In doing so, it disregarded the 29-day cap established in paragraph 2.e. of Mod. 27.

Prior Litigation

117. On 8 October 2010, the government moved to dismiss PWC's appeal, and in the alternative, for summary judgment. The government contended that an unjust enrichment claim required the absence of a valid contract, and since there was an express contract – Contract 3061 and Contract 3119 (Mod. 27) – addressing directly transport fees up to and exceeding 29 days, there could not be a separate "implied-in-law" contract covering the same subject. The government contended that "[t]he only legal basis presented by PWC for its claim and appeal is unjust enrichment," and since unjust enrichment is "premised on the existence of a contract implied by law," and since the

Board had no jurisdiction over implied-in-law contracts, the Board "lacks jurisdiction over PWC's appeal." 11-2 BCA ¶ 34,788 at 171,226, finding 41. In moving for summary judgment, the government contended that the appeal turned on the interpretation of Mod. 27 which "clearly addressed the Government's liability for transportation fees in Iraq," and which "clearly established a maximum liability for each trip." 11-2 BCA ¶ 34,788 at 171,226, finding 42.

118. In response, PWC moved to amend its complaint. Its motion was accompanied by its first amended complaint. PWC urged the Board to grant its motion because amending its complaint "does not change the essential nature or operative facts of the Claim," "would further frame and join the issues," and "would be fair to both parties." In moving to amend its complaint, PWC did not challenge the government's position on unjust enrichment. Nor did it address the government's motion for summary judgment. The introductory paragraph of its first amended complaint said: "Amending the Complaint will also moot portions of the Government's Motion to Dismiss and in the Alternative for Summary Judgment." 11-2 BCA ¶ 34,788 at 171,226, finding 43.

119. The government's 7 December 2010 response opposed PWC's motion to amend. The government asserted that PWC sought to amend its complaint by adding "new legal theories based on new factual allegations," and that PWC's "new counts…exceed the scope of the claim submitted to the contracting officer." 11-2 BCA ¶ 34,788 at 171,227, finding 45.

120. The government's motion for summary judgment was based on contract interpretation. Pointing exclusively to Mod. 27 and its language, the government maintained that "Bilateral Modification P00027 could not state more clearly that PWC is entitled to a maximum of 29 days of fees for trips into Iraq." In moving to amend its complaint, PWC stated if we were to grant its motion to amend to change its legal theory of recovery, the government's summary judgment motion could be rendered moot. PWC said that government counsel agreed that PWC's response to the summary judgment motion should be deferred pending resolution of the government's motion to dismiss. With the parties' agreement, we decided that the government's motion for summary judgment was not ready for decision at that point. 11-2 BCA ¶ 34,788 at 171,230.

121. In a decision issued on 22 June 2011, we agreed with the government that our jurisdiction does not extend to contracts implied-in-law or unjust enrichment. We denied the government's motion to dismiss for lack of jurisdiction and granted PWC's motion to amend its complaint on the basis that we have jurisdiction to resolve contract disputes:

33

Because the operative facts underlying the legal theories PWC presented in its first amended complaint are derived from common or related operative facts which were the subject of numerous e-mails between PWC and the CO and because these same operative facts were presented to the CO as bullet points in its REA attached to and made a part of the certified claim, we conclude that the first amended complaint did not advance new claims not previously presented to the CO.

11-2 BCA ¶ 34,788 at 171,230. The government filed its amended answer to PWC's first amended complaint on 6 September 2011. It did not renew it motion for summary judgment.

## Representative Truck Trips Presented at the Hearing

122. By letter dated 26 January 2012, PWC counsel sent DSCP counsel a 53-page revised spreadsheet of over 29-day truck trips subject to the Mod. 27 appeal. The letter said the spreadsheet provided previously missing information, corrected incorrect information, removed truck trips no longer being pursued, and added truck trips for which supporting documentation had now been found. The revised spreadsheet included 1,750 truck trips totaling $13,367,540 in claims. (Gov't supp. R4, tab 165 at 55) For purposes of the hearing, the parties agreed on 50 truck trips as representative of the 1,750 over 29-day truck trips claimed.[15] Summarizing its trip-by-trip presentation at the hearing, PWC's post-hearing brief contends that, of the 50 samples, it is entitled to 641 of the 645, or over 99.38%, of the over 29-day truck days claimed (app. br., ex. A).

## DECISION

Relying upon the language in paragraph 4 of Mod. 1 – "Trucks will return to PWC upon completion of unloading, and trucks will not be used at the sites for storage purposes" – PWC contends this "dual obligation" was not "eliminated or modified by any subsequent contract modifications" (app. br. at 31-32). PWC contends that "[t]he Government breached the express terms of the Contract by failing to 'return [trucks] to PWC upon completion of unloading' and by using the trucks 'at the sites for storage purposes'" (id. at 30).

---

[15] Pursuant to the Board's 14 January 2014 letter, PWC's letter of 18 February 2014 advised the parties had stipulated that "the 50 truck trips in the sample set to be litigated are representative of the 1,750 truck trips in the Claim giving rise to this Appeal."

PWC contends next that "[t]he Government's use of PWC's trucks as storage and instructions to re-direct deliveries to alternate locations caused PWC's trucks to be delayed in returning to its facility in Kuwait, sometimes over 29 days." It contends these actions were constructive changes to the contract for which it is entitled to compensation. (App. br. at 40)

PWC also contends that the government breached its implied duty to cooperate in failing to "address its severe lack of refrigerated storage capacity in Iraq." PWC said that before agreeing to the 29-day limitation, it expressed "real reservations about the cap being unqualified," and it "reasonably expected that, in agreeing to Mod. 27, it did not assume the risk that it would be required to provide temporary storage units – its trucks – to the Government without compensation," when CO Ford agreed to consider "exceptions to the 29 day rule." (App. br. at 41-42)

We need not decide whether the government constructively changed contract performance or whether it breached its implied duty of cooperation. At its core, whether the government breached the contract comes down to contract interpretation.

### *Paragraph 4 of Mod. 1 was Modified by Paragraphs 2 and 3 of Mod. 27*

PWC contends that the government's "absolute maximum" interpretation of Mod. 27's 29-day cap with no exceptions would "render inoperative and meaningless Mod 1's express prohibition on the Government's use of PWC's trucks for storage," and would similarly "render meaningless the requirement in Mod 1 that the Government shall 'return [PWC's trucks] to PWC upon completion of unloading'" (app. br. at 46-47). PWC asks us to reject the government's post-dispute contention that the parties understood Mod. 1 "deleted" or "voided" the storage prohibition of Mod. 27 (app. br. at 53). PWC contends that, "[b]y its terms, Mod 27 did not revoke any of the terms in Mod 1" but states instead that "[a]ll terms and conditions of the documents referenced in [the Contract] as heretofore changed remain unchanged in full force and effect" (app. br. at 53-54).

DSCP counters that Mod. 1, ¶ 4, "did not create a contractual obligation that the government would not use trucks for storage." It argues that "[t]o the extent Mod 1 did contain such a requirement, it was constructively changed prior to the signing of bilateral Mod 27, and hence has no applicability to truck trips under...Mod 27 or this appeal because it no longer existed when Mod 27 was signed." (Gov't br. at 122) DSCP's constructive change argument is said to be based upon CO Ford's knowledge, approval, and ratification that "PWC's trucks were routinely used for storage" as soon as PWC began delivering food into Iraq in early 2004 and well before Mod. 27 was issued. According to DSCP, ¶ 4 of Mod. 1 "was a nullity long before Mod 27 was issued," because it was constructively changed "during the performance of Mod 2" (*id.* at 121).

It is undisputed that ¶ 4 of Mod. 1 states that "[t]rucks will return to PWC upon completion of unloading, and trucks will not be used at the sites for storage purposes" (finding 8). These commitments, however, were modified by Mod. 27 which GM Switzer signed. Paragraph 3 in conjunction with ¶ 2 of Mod. 27 specifically allowed the use of PWC trucks for storage: Paragraph 2.e. of Mod. 27 allowed the payment of transportation fees beyond the minimums established in ¶ 2.a. (to Iraq "South"), ¶ 2.b. (to Iraq "Central") and ¶ 2.c. (to Iraq "North") up to a maximum of 29 days. Paragraph 3 of Mod. 27 provides that "[t]he 'additional days beyond the established minimum' fees are only applicable if the delay is customer caused." "Customer caused" delay is defined as "Hub, DFAC or MKT not having the capability to off load and return the truck." (Finding 58) As the facts of this case made clear, the lack of capacity to off load and return trucks were quintessentially storage-related issues, we conclude that ¶ 2 and ¶ 3 of Mod. 27, when read together, modified ¶ 4 of Mod. 1's requirements to return trucks upon completing of unloading and not to use them at the sites for storage.

Additionally, PWC's interpretation would ignore the provision in Mod. 27 which states "*Except as provided herein*, all terms and conditions of the document referenced in [the Contract] as heretofore changed, remains unchanged and in full force and effect" (finding 57) (emphasis added). Paragraphs 2 and 3 of Mod. 27 are the exceptions "provided herein." Paragraph 3 allows the payment of transportation fees beyond the established minimums up to 29 days; it allows such payment only if the delays are customer caused. "Customer caused" delay is defined as "Hub, DFAC or MKT not having the capability to off load and return the truck." Inability to off load and to return trucks were storage-related issues. (Finding 58)

When interpreting a contract, the contract must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts. *NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Moreover, an interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous. *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). We cannot harmonize ¶ 4 of Mod. 1 with ¶¶ 2 and 3 of Mod. 27, if, as PWC contends, ¶ 4 of Mod. 1 remained unmodified requiring all trucks, without exception, to be returned upon unloading and not used for storage. That would leave ¶¶ 2 and 3 of Mod. 27 in the same contract useless and inexplicable. On the other hand, ¶ 4 of Mod. 1 can be harmonized with ¶¶ 2 and 3 of Mod. 27 allowing trucks to be kept and used for storage with payment of $645.00 (per reefer) and $475 (per dry truck) per day for "[a]dditional days beyond the established minimum fees" specified in ¶¶ 2.a., 2.b., and 2.c. up to a maximum of 29 days as prescribed in ¶ 2.e., if ¶ 4 of Mod 1 is interpreted to have been modified by ¶¶ 2 and 3 of Mod 27. (Finding 58)

36

### *GM Switzer Agreed to the 29-Day Cap As an Absolute Maximum Allowable for Transportation Fees When He Signed Mod. 27*

Learning from the open-ended payment structure under Mod. 2, CO Ford proposed "a cap on the number of allowable [days for] fees" when she renegotiated the transport fee structure with GM Switzer in September 2004 (finding 49). GM Switzer initially did not have a problem with the concept of a cap and was ready to sign a new modification (findings 50, 53). In his 14 September 2004 email to CO Ford, however, GM Switzer expressed "real reservations about the maximum cap being unqualified" and indicated that PWC would "prefer to have the ability to submit exceptions to the 29 day rule if the situation is unavoidable despite our best efforts to prevent it" (finding 54).

CO Ford and GM Switzer had a discussion the following day, 15 September 2004. As a result of that discussion, CO Ford forwarded a "revised mod" that · established 16 September 2004 as the start date for the new transportation fees. The revised mod did not remove the 29-day cap. CO Ford's email transmitting the revised mod said "exceptions to the 29 day rule will only be considered in the form of a claim." The email told GM Switzer to "Please sign and return the attached mod or *advise if additional changes are required.*" (Finding 56) (Emphasis added)

Given the opportunity to make additional changes, GM Switzer did not take that opportunity. Instead, the Mod. 27 that he signed on 19 September 2004, four days later, included the provision at ¶ 2.e. that stated *"The maximum number of allowable trip days is 29. The Government will not pay transportation fees beyond this established maximum."* (Findings 57, 58) (Emphasis added) We found that GM Switzer understood before he signed Mod. 27 that the 29-day cap CO Ford proposed was, in his word, "unqualified" (findings 54, 55). Because GM Switzer understood the 29-day limitation was "unqualified," he necessarily understood that all risks associated with delays caused by lack of adequate storage and redirection, convoy and escort, weather and road closures, incurred by PWC beyond 29 days were its risks and would not be compensated by the government. Moreover, if GM Switzer was under the impression that by agreeing to consider exceptions to the 29-day cap, CO Ford had abandoned her idea of establishing a cap altogether – the position that his company, PWC, is now taking in advancing its claim – that impression simply did not square with the prohibition plainly stated in ¶ 2.e. of Mod. 27. That GM Switzer did not believe CO Ford would abandon the 29-day cap and chose to go along with the 29-day cap was, to us, the more likely scenario. By not insisting that any exceptions he envisioned to be included as a part of Mod. 27, we conclude that GM Switzer agreed to the terms of Mod. 27 as written when he signed it.

It is well settled that a person's signature on a written instrument signifies assent to the terms of that document. *Alaska American Lumber Co. v. United States,*

37

25 Cl. Ct. 518, 529 (1992). Long ago, the Supreme Court stated: "[i]t will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed it, or did not know what it contained." *Upton v. Tribilcock*, 91 U.S. 45, 50 (1885).

### GM Switzer Knew and Therefore PWC is Bound by CO Ford's Interpretation of the 29-Day Rule

It is also a rule of contract interpretation that "[i]f one party to a contract knows the meaning that the other intended to convey by his words, then he is bound by that meaning." *Cresswell v. United States*, 146 Ct. Cl. 119, 127 (1959); *Perry and Wallis, Inc. v. United States*, 427 F.2d 722, 725 (Ct. Cl. 1970); *United Technologies Corp., Pratt & Whitney Group, Government Engines and Space Propulsion*, ASBCA Nos. 46880, 46881, 97-1 BCA ¶ 28,818 at 143,800 (Navy personnel assured contractor that use of the word "intends" was purely for the purpose of overcoming an internal legal objection and was not meant to diminish the Navy's guarantee that contractor would be awarded 30% of the engine procurement over five years.).

In this case, even though CO Ford said in her 15 September 2004 email that "exceptions to the 29 day rule will only be considered in the form of a claim" (finding 56), GM Switzer knew that did not mean that the government would pay for all over 29-day truck delays as PWC is now contending. We know this because after reviewing PWC's weekly over-10 day report, GM Switzer emailed CO Ford on 24 October 2004, a month after Mod. 27 was signed, and commented "we do have the makings of a problem with the new Transport Mod that limits our billing for only 29 days." He asked "What are we suppose to do with the 105 vehicles now over 29 days?" (Finding 73)

We found GM Switzer's acknowledgment that Mod. 27 limited PWC's billing "for only 29 days," and that Mod. 27 "[had] the makings of a problem" reflected his understanding at the time that Mod. 27 provided no relief for trucks that did not return in 29 days. If GM Switzer had understood that CO Ford had agreed to provide relief for any customer-caused delays beyond 29 days, he would not have asked "What are we suppose to do with the 105 vehicles now over 29 days?" (Finding 74)

In December 2004, DSCP approached GM Switzer about extending Contract 3061 (finding 79). Based on GM Switzer's 8 December 2004 response that "this is no guarantee of being paid" under the 29-day rule, we found that he understood CO Ford's willingness to consider granting a claim was a matter of discretion given the right circumstances and not a matter of contract right (finding 80).

In response to CO Ford's 13 January 2005 email, GM Switzer's reply of the same day said he had "no problem with extending the contract at the same terms" but

asked that "the 29 day transport limitation rule for Iraq be rescinded" (finding 82). Despite CO Ford's refusal to rescind the 29-day rule, PWC agreed to extend Contract 3061 from 16 February through 15 December 2005 by way of a bridge contract (Contract 3119 or PV Bridge contract) on the same contract terms. Thus, knowing CO Ford's interpretation of Mod. 27 – that PWC assumed all risks of delay over 29 days – PWC nonetheless agreed to extend Contract 3061 for 10 more months. (Finding 86) In terms of PWC's certified claim, the PV Bridge contract covered the last two weeks of Submission II (Jan – Feb 2005), all of Submission III (Mar – Sept 2005) and all of Submission IV (Oct 2005 – Feb 2006) (finding 117).

Because GM Switzer knew how CO Ford was applying the 29-day rule before he signed Mod. 27 and before he agreed to extend Contract 3061, we hold that PWC, is bound by CO Ford's interpretation.

### *CO Ford's Pre-Dispute Interpretations were Consistent that PWC's Claims did not Qualify as Exceptions to the 29-Day Rule*

PWC argues that we "should give the parties' pre-dispute interpretation of the Contract great weight" (app. br. at 47). PWC asks us not to "ignore the overwhelming course-of-performance evidence, and accept the CO's uncorroborated, self-serving testimony that the 29-day cap was an 'absolute maximum' with no exceptions" (app. br. at 53).

In support, PWC said that COR Burkett testified that during performance of Mod. 27 "he understood that DSCP interpreted the 29-day cap to permit exceptions." His understanding was said to have been derived from conversations with CO Ford. (App. br. at 49)

According to PWC, when it submitted its first claim based on exceptions to the 29-day rule, on 24 February 2005, neither CO Ford nor anyone at DSCP reacted with surprise or took the "hard-line stance" that Mod. 27 "imposed an 'absolute cap'" (app. br. at 50); instead, CO Ford asked DSCP contract specialist to review and analyze whether storage caused the excess trip days (app. br. at 51). PWC says when it submitted its second claim based on exceptions to the 29-day rule, on 25 May 2005, CO Ford did not flatly reject the claim but agreed to continue discussion (app. br. at 51). PWC tells us that, in September 2005, over a year after Mod. 27 was executed, CO Ford in an internal email stated "[m]y intent was to deny both claims based on lack of supporting cost data." PWC contends that CO Ford did not base her intent to deny PWC's claims "on the 29-day cap." (App. br. at 51) PWC tells us when it filed its third claim based on exception to the 29-day rule on 26 October 2005, CO Ford advised "it is [DSCP's] intent to deny the 'over 29-day' claim for inadequate support documentation" and "did not rely on any 'absolute maximum'" (app. br. at 52).

39

It has long been recognized that in contract interpretation disputes, "the greatest help comes, not from the bare text of the original contract, but from external indications of the parties' joint understanding, contemporaneously and later, of what the contract imported." Another way of putting this legal concept is "how the parties act under the arrangement, before the advent of controversy, is often more revealing than the dry language of the written agreement by itself." *Macke Company v. United States*, 467 F.2d 1323, 1325 (Ct. Cl. 1972); *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1566 (Fed. Cir. 1987) ("One may not ignore the interpretation and performance of a contract, whether termed 'mistake' or not, before a dispute arises."); *WDC West Carthage Associates v. United States*, 324 F.3d 1359, 1363 (Fed. Cir. 2003); *Chase & Rice, Inc. v. United States*, 354 F.2d 318, 321 (Ct. Cl. 1965) (stating that interpretation of contract by the parties before contract becomes the subject of controversy is deemed to be of great, if not controlling weight).

Like many who were not directly involved with the negotiations of Mod. 27, COR Burkett was initially confused about the submission of PWC's 24 February 2005 (first) over 29-day claim (finding 89). It did not take long for CO Ford to explain to COR Burkett that PWC had "no written contractual right to payment" and PWC's claim was "different from invoices" it submitted for truck trips within the 29-day cap (findings 90, 92). The fact that CO Ford told COR Burkett that she "will be requesting more cost verification data" on PWC's 24 February 2005 claim (finding 90) indicates that she did not agree to allow payment of over 29-day truck trips simply because they were beyond PWC's control. There is no evidence that CO Burkett approved any over-29 day truck trips (finding 92).

When GM Switzer asked CO Ford in January 2005 to rescind the 29-day rule in connection with extending Contract 3061 (finding 82), CO Ford replied she could not "simply rescind mod 27 without doing some additional analysis" because the average turnaround time considered in imposing the 29-day cap had "not significantly changed." She urged GM Switzer to submit an alternate proposal "based on actual cost and historical truck turn around time frames." (Finding 83) CO Ford's refusal to rescind the 29-day rule without additional analysis and her request for an alternate proposal "based on actual cost" do not support a conclusion that she agreed with PWC's interpretation that all over 29-day truck trips qualified as "exceptions" to the 29-day rule.

The evidence shows when GM Switzer submitted PWC's alternate proposal on 14 March 2005 (finding 95), CO Ford rejected the proposal because her data showed "the average trip times were going down" (finding 96). Average truck trip data would have been irrelevant to CO Ford if she had interpreted her agreement with GM Switzer to allow payment of over 29-day truck trips as exceptions to the 29-day rule.

40

When Paice took over responsibility for PWC's over 29-day claims, he emailed CO Ford on 7 August 2005 and asked what he needed to submit for over 29-day claims that differed from normal billing (finding 98). CO Ford's 16 August 2005 email asked Paice to send "mountains of paperwork" to show that the delays claimed were "in fact customer caused." More importantly, CO Ford asked for "actual demurrage cost data," and "actual cost data" in support of the $2.9 million claimed in addition to the $8.7 million paid. (Finding 99)

Had CO Ford agreed to pay $645.00 per reefer and $475.00 per dry truck as exceptions to the 29-day cap for each day these trucks were out over 29 days beyond PWC's control, she would not have asked PWC for "actual demurrage cost data," "actual cost data" and whether PWC's "cost actually exceeded" the $8.7 million paid. We found the fact that CO Ford repeatedly asked for cost data reflected her understanding or interpretation that to qualify as exceptions to the 29-day rule, PWC must demonstrate by cost data that (1) the generous 29-day cap for all trucks was unfair, unreasonable, or inequitable and (2) it had reached a point where its ability to continue performance under Contract 3061 was threatened. We found CO Ford was consistent in her position on the circumstances under which exceptions to the 29-day rule would be considered. (Finding 100)

Contrary to PWC's contentions, we conclude CO Ford consistently took the position during the course of performance that PWC's over 29-day claims did not qualify as "exceptions" to the 29-day rule.

## CONCLUSION

Because PWC agreed to the terms of Mod. 27 providing that the government would not pay transportation fees beyond 29 trip days, because PWC has failed to prove that the government interpreted Mod. 27 inconsistently, and because PWC failed to prove that its claims qualified as exceptions to the 29-day cap, we deny the appeal.

Dated: 5 August 2015

PETER D. TING
Administrative Judge
Armed Services Board
of Contract Appeals

(Signatures continued)

41

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the
Armed Services Board of Contract Appeals in ASBCA No. 56022, Appeal of The
Public Warehousing Company, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

42